FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAY 01, 2015 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

TSIPI YERUHAM,

                         Plaintiff,

        -against-

UNITED STATES OF AMERICA,

                         Defendant.
----------------------------------------------------------X

12 CV 6389 (SJ) (VMS)

MEMORANDUM
AND ORDER

A P P E A R A N C E S:

BERNSTONE AND GRIECO, LLP
295 Madison Avenue – 25th Floor
New York, New York 10017
By:    Peter B. Croly
Attorney for Plaintiff

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By:    Nancy A. Miller
       James R. Cho
Attorneys for Defendant

JOHNSON, Senior District Judge:

      This case is brought by Tsipi Yeruham ("Yeruham" or "Plaintiff") against

the United States of America (the "Defendant") under the Federal Tort Claims Act

1

("FTCA"), 28 U.S.C. § 2671 et seq., for alleged personal injuries sustained due to an automobile accident with John Radzicki ("Radzicki"), a Special Agent with the Federal Bureau of Investigations ("FBI") (the "Accident").

The case was tried before this Court without a jury, in accordance with 28 U.S.C. § 2402, on October 27 and 28, 2014. After carefully considering the evidence introduced at trial, the testimony by Plaintiff's and Defendant's witnesses, the parties' submission, and the controlling law on the issues presented, the Court makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).

## I.   **FINDINGS OF FACT**

### A.   **The Accident**

1.   Plaintiff is a 44 year old woman, who is married with five children between the ages of 6 and 16. The last child, Moshe, was born in November 2008. (Transcript of Proceedings Dated October 27–28, 2014 ("Tr.") 78.) Radzicki was employed by the Defendant United States of America and was working for the FBI at the time of the Accident. (Tr. 15.)

2.   On January 10, 2011, at approximately 9:15 a.m., Plaintiff and Radzicki were involved in a motor vehicle accident at the intersection of East 64th Street and Mayfair Drive North in Brooklyn, New York. (Tr. 17, 18, 54,

2

77, 84, 85, 86.) Plaintiff was driving a Dodge Caravan minivan with her then two-year old son Moshe and her babysitter, Angelica Romero ("Romero"). Radzicki was operating a Buick LaCrosse sedan provided to him by the FBI for his use through the course of his employment, including at the time of the collision. (Tr. 16, 17, 87.)

3. East 64th Street runs in the direction of north and south, while Mayfair Drive North runs in the direction east and west. Both are two-way streets, with one lane for traffic and one lane for parking in each direction. (Tr. 19, 23, 25, 91.) At the intersection, a stop sign controls traffic on Mayfair Drive North, the road on which Radzicki was driving, and there is no stop sign for traffic on East 64th Street, the road on which Plaintiff was driving. (Tr. 20, 92.)

4. Radzicki was headed east on Mayfair Drive North when he stopped at the stop sign at the intersection. He looked left and right, saw no oncoming traffic, then looked left again before proceeding into the intersection. There was nothing obstructing Radzicki's view from his right, and he saw no oncoming traffic. (Tr. 19, 21, 24, 28, 30.)

5. Plaintiff was heading north on East 64th Street. (Tr. 25.) She left her home at 2558 East 65th Street and was en route to her son's daycare center located three blocks away. (Tr. 77, 88, 89, 133.)

3

6.   Plaintiff's front bumper struck the front passenger side of Radzicki's vehicle when Radzicki entered the northbound traffic lane. (Joint Exh. 2.) At the point of impact, Radzicki was driving less than 10 miles per hour and Plaintiff was driving between 20 and 30 miles per hour. (Tr. 35, 57, 94.) Both drivers saw the other car for the first time at the moment of impact or the second before the impact. (Tr. 34, 98.)

7.   The two cars came to a complete stop near the northeast corner of the intersection, with Plaintiff's minivan hitting a wooden telephone pole. (Tr. 36, 37, 56; Joint Exh. 2 at 3, 5.) As a result of the impact, Plaintiff struck her right knee against the bottom of the dashboard, hit her chest against the seatbelt, injured her lip against the deployed airbag, and was "tossed around." (Tr. 98.)

8.   Immediately after the Accident, Plaintiff lifted herself over the center console and exited her car through the passenger side, while her son and Romero exited through the back door. (Tr. 99.) She called her husband and instructed Romero to take her son home.[1] (Tr. 99–100.) Shortly thereafter,

---

[1]   On October 27, 2014, the Government requested that the Court draw an adverse inference due to Plaintiff's failure to provide the Government with contact information for Romero. The Government argues that the missing witness inference, which allows the factfinder to draw an adverse inference that testimony of a missing witness would have been unfavorable to the party who failed to produce the witness, is applicable here. United States v. Torres, 845 F.2d 1165, 1169 (2d Cir. 1988). Because the Court need not discuss liability, determination of this issue is inconsequential.

P-049

Plaintiff's husband arrived at the scene of the Accident with the son, and left with the son prior to the police's arrival. (Tr. 59, 102, 243.)

9. Plaintiff felt no pain at the time of the Accident, and indicated to Radzicki that she and her passengers were okay. She did not, at that time, require an ambulance. (Tr. 48, 49, 58, 101.)

10. When the police arrived, Plaintiff and Radzicki provided their statements; however, due to the absence of Plaintiff's son and Romero and Plaintiff's failure to report their involvement, the police report reflects that there were no passengers in Plaintiff's car. (Tr. 49, 59, 101, 240, 242.)

11. Approximately 45 minutes after the accident occurred, Plaintiff's husband returned to the scene after dropping off the son at the daycare center. Plaintiff entered her husband's car, where they conversed for a period of time. (Tr. 59, 101, 102, 243.) After speaking with her husband, Plaintiff exited his car and complained to the police of dizziness, and pain in her back, knee, and neck. She requested an ambulance. (Tr. 101, 243.)

12. When the ambulance arrived, she was able to climb onto the ambulance unassisted and was transported to Beth Israel Medical Center ("Beth Israel"). (Joint. Exh. 22; Tr. 48, 51, 101.) She was triaged at approximately 11:20 a.m. Her medical records from Beth Israel indicate that her chief complaints were "back, neck, right chest pain, nausea, headache, and pain

5

all over," with a pain level of 6 out of 10. Plaintiff denied having any loss of consciousness and head trauma. (Joint. Exh. 22.)

13.	She was given an x-ray, which revealed a normal lumbosacral spine alignment and curvature. The report indicated "no evidence of compression fracture, bone destruction, or arthritic change." She was diagnosed with low back, musculoskeletal chest, and neck pain.  At 3:10 p.m., after Plaintiff reported to be "feeling much better," she was discharged home and was given medication and muscle relaxants to manage her symptoms for 5 to 6 days.  She was instructed to follow up if her symptoms worsened or failed to improve. She was also instructed that she could resume her daily activities with care. (Joint Exh. 22.)

**B.	Pre-Existing Health Conditions**

14.	Seth U. Brum, M.D., was Plaintiff's primary care physician from approximately 2003 until February 2011, one month after the Accident. (Joint Exh. 16.) According to Dr. Brum's records, Plaintiff had a history of headaches and hypertension.  (Joint Exh. 16.) Plaintiff complained of numbness in her hands on October 25, 2004 and December 6, 2004, which Dr. Brum noted was a persistent problem. (Joint Exh. 16.)  On May 18,

6

2005, Plaintiff complained of pain in her neck and shoulder. (Joint Exh. 16.)

15. The Accident is, at the very least, the second accident in which Plaintiff has been involved. In 2006, she was involved in an unrelated car accident in 2006, after which she also reported neck and back pain. (Joint Exh. 16.) That year, she underwent physical therapy for her injuries. (Joint Exh. 6 at 1; Tr. 226.)

16. Three years later, on March 23, 2009, Plaintiff complained of right knee pain and underwent an x-ray examination. (Joint Exh. 16 at 61.)

17. Plaintiff experienced more neck pain, lower back pain, dizziness, and facial numbness, which she reported had commenced in or about April 2008 and continued to worsen. She was eventually evaluated for these complaints by neurologist Dr. Ludmila Feldman on October 28, 2009. (Tr. 431; Joint Exh. 16.) In November 2009, Plaintiff underwent a Magnetic Resonance Imaging ("MRI") test of the cervical and lumbar spine.

18. The lumbar MRI was conducted to evaluate Plaintiff's complaints of lower back pain and numbness in her lower extremities. The MRI demonstrated degenerative changes, including a disc bulb with overgrowth at L3-L4. (Joint Exh. 19.)

P-049

19. The cervical MRI was conducted to evaluate Plaintiff's complaints of neck pain and numbness in her arms. The cervical MRI also demonstrated degenerative changes. Specifically, the radiologist found "disc space narrowing and disc desiccation at C5-C6. There is disc desiccation at C3-C4 with milder changes at C2-C3 and C4-C5. No focal herniation is seen. There is no evidence of spinal stenosis." (Joint Exh. 18.)

### C. Plaintiff's Post-Accident Treatment

20. On January 20, 2011, ten days after the Accident, Plaintiff presented to Dr. Brum and complained of nausea and head pain. Dr. Brum ordered an MRI, which revealed that Plaintiff suffered from a sinus disease, which was unrelated to the Accident and could sometimes cause headaches. (Tr. 103, 201, 202; Joint Exh. 16.)

21. Despite her complaints of pain and nausea, however, Plaintiff and her family went on a cruise in February 2011. Plaintiff stated that Dr. Brum permitted the trip, because it was an opportunity for Plaintiff "to relax." Upon returning from her vacation in March, Plaintiff's pain resumed and worsened. (Tr. 105, 106.)

8

### 1. Treatment by Alexander Berenblit, M.D.

22. A friend referred Plaintiff to Dr. Alexander Berenblit, a neurologist. (Tr. 105.) On March 17, 2011, Plaintiff presented to Dr. Berenblit and complained of occipital pain. (Tr. 249; Joint Exh. 6.) Dr. Berenblit diagnosed the following: (1) traumatic head injury; (2) sprain/strain of the cervical spine; (3) traumatic cervical radiculopathy with cervical pain; (4) sprain/strain of the thoracolumbar spine; (5) traumatic lumbar radiculopathy with lower back pain to be ruled out; and (6) bilateral contusions of the knee joints. (Joint Exh. 6 at 8.)

23. Dr. Berenblit also found limitations in Plaintiff's range of motion in the cervical spine as follows: Flexion 40 percent, with normal 50 percent, thus 80 percent of normal; Extension 45 percent, with normal 60 percent, thus 75 percent of normal; Right lateral flexion 35 percent, with normal 45 percent, which was 78 percent of normal; Right rotation 60 percent, with normal 80 percent, which was 75 percent of normal; Left rotation was 65 percent, with normal 80 percent and lumbar spine. (Joint Exh. 6, 23.)

24. In March, Plaintiff commenced physical therapy, acupuncture, chiropractic, and massage services with Dr. Berenblit, which continued for seven months, until October 2011. (Tr. 107–08.) She underwent therapy to reduce her muscle spasm and level of pain and testified that the therapy

9

substantially decreased her pain level to 2 or 3 out of 10. She terminated her therapy in or about October 2011 because her no-fault insurance ceased payment. (Tr. 107, 108, 129, 174.)  Dr. Berenblit also provided Plaintiff with disability certificates stating that she was "totally incapacitated" from January 10, 2011 until October 31, 2011, which Plaintiff used to collect No-Fault Insurance proceeds from New York Central Mutual Insurance Company. (Joint Exh. 6; Gov't Exh. 5; Pl. Exh. 2.)

### 2. 2011 Cervical MRI

25.  In March 2011, Plaintiff underwent another series of MRI tests of the cervical and lumbar spine. (Joint Exh. 3–5.)  At trial, the parties' experts disagreed as to the accurate interpretation of these tests.

26.  The Plaintiff presented Irving Friedman, M.D., a neurologist, as her expert witness.  Dr. Friedman evaluated image 4 out of 9 of the 2011 cervical MRI, and found herniated discs at C3-C4 and C4-C5, as well as a large herniated disc extending beyond the vertebral body into the spinal cord at C5-C6. (Tr. 158–62.)

27.  However, the Government's expert neurologist, Dr. Arthur Rosen, disagreed with Plaintiff's expert.  Dr. Rosen opined that Plaintiff's expert reviewed image 4, which is not the "midline" image required for viewing

10

the sagittal view of the cervical spine, and as a result, skewed Dr. Friedman's opinion. (Tr. 344, 345.) Defendant's expert points out that image 5 is centered and represents the midline image. After Defendant's expert evaluated the midline image, he found conditions that were substantially similar to those found in Plaintiff's 2009 MRI results. He opined that the 2011 results were simply a continuation of the pre-existing degenerative condition (disc desiccation), and were not new disc herniations. (Tr. 387, 402.) Defendant's expert further testified that the axial images of the 2011 cervical MRI found no impingement of Plaintiff's cervical spine nerve roots at any level, and thus was not pain-inducing. (Tr. 355–64.)

### 3.   2011 Lumbar MRI

28.   With respect to the 2011 lumbar MRI results, Plaintiff's expert noted that an impingement existed on the thecal sac, which did not necessarily cause pain. (Tr. 178, 205.) He further conceded that the results from 2009 were similar to those from 2009, indicating signs of disc degeneration and arthritis. (Tr. 178.) Defendant's expert reviewed the 2011 lumbar MRIs and similarly testified that Plaintiff's lumbar MRI revealed only degenerative conditions, which were pre-existing. (Tr. 370–75.)

11

### 4. Other Examinations

29. Plaintiff underwent Electromyograpgy, Electronystagmography, and Electroencephalogram testings, all of which were found to be within normal limits. (Joint Exh. 7, 10, 11; Tr. 335.)

### D. Alleged Limitations

30. Plaintiff is the President and owner of Fantasy Party, an adult store located in the West Village in Manhattan, where she handles the book-keeping. Prior to the Accident, she also worked the floor, ordered merchandise, worked the register, and fixed the shelves, among other things, and she worked an average of 40 to 45 hour per week. (Tr. 79, 81, 90, 111.) At home, she was responsible for readying the children in the morning for school and day care, house-keeping, and cooking. She also enjoyed playing with the children. (Tr. 119.)

31. As a result of the Accident, she alleges that she can no longer engage in her work activities. She testified that she was out of work for about 11 months following the Accident and that she can no longer play with the children, ready them for school and day care, and perform other household duties, since doing so would result in pain. (Tr. 112, 124, 125.)

P-049

32. Plaintiff moved to Israel in June of 2012, in order for her in-laws to lend her some assistance in her at-home duties. She also wanted to escape the cold New York weather, which seemed to exacerbate her pain. (Tr. 122.)

33. As of the trial date in October 2014, Plaintiff continued to maintain Fantasy Party's finances remotely from her computer in Israel, which occupies about 15 hours of her week. (Tr. 112.)

34. Plaintiff continues to complain of pain in the back of her head, back, neck, and right knee. (Tr. 118.) Since moving back to Israel, she has not undergone any further medical treatment. (Tr. 110–11.) She also continues to travel internationally, and has been to New York four times, a trip that is approximately 12 hours in duration. (Tr. 111, 257.)

## II. CONCLUSIONS OF LAW

### A. Legal Standard

35. As a federal court sitting in diversity, the Court applies the substantive law—in this case, the tort law—of New York. See McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir. 1997). New York's No Fault Law, N.Y. Ins. L. § 5101, et seq., is intended to "significantly reduce the number of automobile personal injury accident cases litigated in the courts." Lopez v. Senatore, 65 N.Y.2d 1017, 1020 (1985) (quoting Licari v. Elliott, 57

13

N.Y.2d 230, 236 (1982)).    In order to recover damages, Plaintiff must

establish that she has suffered a "serious injury." N.Y. Ins. L. § 5104(a);

Molina v. United States, 301 F. Supp. 2d 317, 320 (S.D.N.Y. 2004).

36.    "Serious injury" is defined in Section 5102(d) as:

> a personal injury which results in death; dismemberment;
> significant disfigurement; a fracture; loss of a fetus;
> permanent loss of use of a body organ, member, function
> or system; permanent consequential limitation of use of a
> body organ or member; significant limitation of use of a
> body function or system; or a medically determined injury
> or impairment of a non-permanent nature which prevents
> the injured person from performing substantially all of the
> material acts which constitute such person's usual and
> customary daily activities for not less than ninety days
> during the one hundred eighty days immediately following
> the occurrence of the injury or impairment.

N.Y. Ins. L. § 5102(d); see Yanez v. City of N.Y., 29 F. Supp. 2d 100,

112–13 (E.D.N.Y. 1998).    To prevail, "plaintiff must present objective

proof of injury, as subjective complaints of pain will not, standing alone,

support a claim for serious injury." Yong Qin Luo v. Mikel, 625 F.3d 772,

777 (2d Cir. 2010).


### B.    Application

37.    Plaintiff alleges that she satisfies Section 5102(d) in three ways: (1) the

Accident caused a permanent consequential limitation of use of her

cervical and lumbar spine; (2) the Accident caused a significant limitation

14

of use of her cervical and lumbar spine; and (3) the Accident caused a medically determined injury of a non-permanent nature which prevented her from performing substantially all of the material acts which constituted her usual and customary daily activities for not less than 90 days during the 180 days immediately following the Accident (the "90/180 day" rule). (Joint Pretrial Order at 2–3.) She alleges that the herniated and bulging discs cause local and radiating pain, limit her range of motion, and prevent her from engaging in her normal life activities.

### 1.  Permanent Consequential Limitation

38. To establish serious injury through the permanent consequential limitation of the use of a body organ or member, Plaintiff must demonstrate, through competent medical evidence, that her injury was both permanent and consequential. See Tsveitel v. Geoghegan, No. 05-CV-5721, 2009 WL 2182379, at *5 (E.D.N.Y. July 21, 2009). While permanent pain, even of an intermittent character, may form the basis of a serious injury, a plaintiff must provide objective medical evidence of the permanence of the pain and must show that the pain is of sufficient severity that it causes some form of physical limitation. See Booker v. Miller, 685 N.Y.S.2d 837, 837 (1999) (internal quotations omitted); see also Gaddy v. Eyler, 570 N.Y.S.2d 853,

15

856 (N.Y. App. Term 1991) ("pain and discomfort, unsupported by credible medical evidence which diagnoses and identifies injuries, are alone insufficient to sustain a finding of serious injury"). Furthermore, permanent injuries already in existence at the time of the car accident will not qualify as "serious injuries." See Houston v. Gajdos, 782 N.Y.S.2d 839 (N.Y. App. Term 2004) (granting summary judgment where plaintiff's MRI only showed pre-existing conditions); see also Frank v. Jones, 686 N.Y.S.2d 110 (N.Y. App. Term 1999) (granting summary judgment where medical experts concluded that injuries pre-dated the accident).

39. Here, Plaintiff's medical records and Defendant's expert's credible testimony elicited at trial do not support the claim that she suffered any permanent consequential limitation of use of her cervical and lumbar spine, or any other body organ or member, as a result of the Accident. The facts established that Plaintiff had pre-existing degenerative conditions, which were apparent in her 2009 MRI test results. Both experts opined that the 2011 lumbar MRI image was indicative of a degenerative condition similar to those found in the 2009 evaluations. Defendant's expert credibly opined that Plaintiff's 2011 cervical MRI showed the continuation of a pre-existing degenerative condition.

40. To the extent that Plaintiff's expert concluded that Plaintiff's injuries

16

resulted from the Accident, he also testified that he did not review all the relevant documents in rendering his opinion, including records indicating that Plaintiff had been injured in a previous car accident and had received physical therapy as a result. Thus, his conclusion failed to take into account all possible causes for Plaintiff's complaints. Additionally, Plaintiff's expert's evaluation of the cervical MRI was skewed because he did not evaluate the midline image.

41. The Court also notes that Plaintiff's treatment following the Accident was limited to approximately seven months of physical therapy. She also reported taking pain medication only during the days that immediately followed the Accident. Plaintiff did not provide any medical evidence to explain the gap in medical treatment after she terminated her physical therapy in October 2011 until two years later, in October 2013, when she underwent a medical assessment following the commencement of this case. Thus, the gap in treatment was "in reality, a cessation of all treatment." Pommells v. Perez, 4 N.Y.3d 566, 574 (2005). Therefore, the only evidence indicating that Plaintiff's pain was permanent are Plaintiff's subjective complaints of that pain, which is insufficient to establish a serious injury under the "permanent consequential limitation" category.

17

### 2. <u>Significant Limitation</u>

42. A "significant limitation" differs from a "permanent injury" in that the former does not require permanence, but rather requires that the alleged dysfunction be "important enough to reach the level of [being significant]." <u>Miller v. Miller</u>, 100 A.D.2d 577, 578 (N.Y. App. Term 1984). In order to show <u>prima</u> <u>facie</u> "significant limitation," a plaintiff must prove "significant limitation in both degree and duration," and the limitation must be greater than minor, slight, or mild. <u>See</u> <u>Jones v. United States</u>, 408 F. Supp. 2d 107, 120 (E.D.N.Y. 2006); <u>see</u> <u>also</u> <u>Gualtieri v. Farina</u>, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003); <u>see</u> <u>also</u> <u>Licari v. Elliott</u>, 455 N.Y.S.2d 570 (1982). Like permanent injuries, objective medical findings are crucial for the court's proper determination of whether the injury poses a significant limitation. <u>See</u> <u>Ventra v. United States</u>, 121 F. Supp. 2d 326, 333–34 (2000).

43. Here, Plaintiff's 2011 cervical and lumbar MRI images exhibited a degenerative disease. However, the alleged limitation caused by this condition pre-dates the Accident, since Plaintiff had pre-existing degenerative disc desiccations in her cervical and lumbar spine, as has been determined above.

44. Additionally, even if Plaintiff's significant limitations of function of the

18

cervical and lumbar spine and its consequential effects on other part of her body were exacerbated by the Accident, this Court, as a finder of fact, does not deem those exacerbations to be significant limitations. See Miller, 100 A.D.2d at 578 ("[T]he question of whether the injury is 'significant' . . . would ordinarily be a question of fact for the jury"). This Court is not convinced that an individual who experienced a traumatic injury from a car accident would immediately be able to lift herself over an arm rest, remain ambulatory, and travel internationally merely days after the accident. Although Plaintiff's expert testified that it is not unusual for an individual with a traumatic herniated disc to not immediately feel pain, the Court finds more persuasive Defendant's expert, who opined that a patient would feel such trauma immediately, and would not be able to move, let alone shift her body to lift herself over a car arm rest and exit through the passenger side of a car. Thus, this Court remains skeptical that Plaintiff's injuries correlate to the Accident, and declines to conclude that Plaintiff's present physical limitations and continuing pain are attributable to the Accident rather than to the degenerative conditions or her prior accident. Jimenez v. Rojas, 810 N.Y.S.2d 449, 450 (N.Y. App. Term 2006).

45. Because Plaintiff has not established by a preponderance of the evidence that the injuries reported in 2011 were caused by the January 2011

19

collision, Plaintiff has not suffered a "severe injury."

### 3. 90/180 Day Rule

46. To succeed under the 90/180 day rule, Plaintiff must demonstrate that she was restricted in performing substantially all of the material acts that constitute her usual and customary activities for 90 out of 180 days following the injury. N.Y. Ins. L. § 5102(d). In adjudicating a 90/180 claim, "the words 'substantially all' should be construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment." Licari v. Elliott, 455 N.Y.S.2d, 570, 570 (1982). A plaintiff's inability to work, whether or not she can perform other "usual activities," is sufficient alone to make out a prima facie 90/180 claim. Mercado v. Lee, No. 04 Civ. 7166, 2008 WL 4963985, at *5 (S.D.N.Y. Nov. 21, 2008). Nevertheless, as with the two prior categories, Plaintiff's claimed inability to work must be substantiated by objective medical evidence. See Jackson v. New York City Trans. Auth., 708 N.Y.S.2d 469, 470 (2000) ("[P]laintiff's self-serving affidavit stating that she was unable to return to work . . . without a physician's affidavit substantiating the existence of a medically determined injury which caused the alleged limitation of her activities [i]s insufficient" to make out a

20

90/180 claim). This ninety-day requirement is to be construed literally and is a necessary condition to bringing a claim. See Tsveitel, 2009 WL 2182379 at *4.

47. Here, Plaintiff has failed to establish, through objective medical evidence, that she was restricted in performing substantially all of her usual and customary activities for 90 of the first 180 days following the Accident. The relevant time period under this section ended on July 10, 2011. Beth Israel's records indicate that Plaintiff was ambulatory on January 10, 2011, the day of the Accident, and stated that her complaints of pain would resolve within a matter of days. Plaintiff's medical records further noted that Plaintiff could "resume normal daily activities." Plaintiff was released that same day with a few days' worth of medications.

48. Additionally, Dr. Brum's record from Plaintiff's visit on January 20, 2011, notes that Plaintiff felt "very nauseous" and experienced "head pain," but provides no indication that she was unable to perform her usual and customary activities. Notwithstanding Plaintiff's complaint of nausea, Dr. Brum approved Plaintiff's international travel and cruise vacation only weeks after the Accident. Although it is unlikely that a cruise vacation would alleviate Plaintiff's nausea, it appears that Dr. Brum, nonetheless, encouraged that Plaintiff proceed with the trip because Plaintiff's

21

complaints were not significant enough to outweigh Plaintiff's desire to "just . . . relax."

49. Further, neither Plaintiff nor her expert proffered testimony at trial as to any objectively-determinable medical condition that required Plaintiff to restrict substantially all of her normal daily activities at work or at home as a result of the Accident. To the extent that Dr. Berenblit issued Certificates of Disability to enable Plaintiff to collect No-Fault insurance payments, the Court declines to find that these certificates are sufficient to make out a prima facie 90/180 claim, as they contain false statements. Plaintiff's first appointment with Dr. Berenblit occurred on March 17, 2011; the certificates states, however, that Plaintiff had been under the professional care of Dr. Berenblit since January 10, 2011. The certificates also state that Plaintiff was "totally incapacitated," which contradicts Beth Israel's and Dr. Brum's evaluation of Plaintiff.

50. In addition, the Court is not moved by Plaintiff's claim that she was unable to engage in her book-keeping duties at Fantasy Party, especially since Plaintiff currently works in this capacity remotely from Israel on her computer in her current state of pain. Also, as the President and owner of Fantasy Party, Plaintiff was free to schedule her own hours at any point, delegate tasks, or put them off for 90 days. This is not a case where an

22

injured individual has to inform a supervisor that they cannot work and therefore will lose sick time or pay, or risk job security on account of the injury. Missing work under circumstances such as those lead to a stronger suggestion that the individual is truly restricted in physical capabilities than an entrepreneur's self-serving report that she was unable to work. Taken together, Plaintiff does not, by the preponderance of the evidence, establish that she was substantially restricted from her normal work activities.

51. To the extent Plaintiff testified that she was restricted in performing her at-home duties such that she relocated to Israel, Plaintiff provides no objective medical testimony to establish that she was indeed unable to engage in these activities. Plaintiff's relocation to Israel did not occur until June 2012, which falls outside the 180-day period, and subjective complaints of pain prior to July 10, 2011, are self-serving and fail to meet the requirements of a 90/180 claim.

52. Consequently, because Plaintiff has failed to establish that the Accident caused any injury that resulted in a 90–out–of–180–day curtailment of substantially all of her usual and customary daily activities, Plaintiff has not suffered a "severe injury" under this category of Section 5102(d).

23

## III.   CONCLUSION

For the foregoing reasons, the Court finds that, based upon the preponderance of the evidence, Plaintiff Tsipi Yeruham has failed to establish a "serious injury" under Section 5102(d) of the New York Insurance Law. Accordingly, it is hereby ordered that judgment on all claims be entered in favor of Defendant, the United States of America, and the Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: May _1_, 2015
      Brooklyn, New York

/s/ U.S.D.J. JOHNSON
Hon. Sterling Johnson, Jr., Senior U.S.D.J.

P-049